James C. Shah
Shepherd Finkelman Miller
 & Shah, LLP
475 White Horse Pike
Collingswood, NJ 08107
Telephone: (856) 526-1100
Facsimile:  (866) 300-7367
Email: jshah@sfmslaw.com

*Attorney for Plaintiff and the Plan*

[Additional Counsel Listed On Signature Page]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HEATHER JANDA HAY, Individually and On Behalf of the GUCCI AMERICA, INC. RETIREMENT AND SAVINGS PLAN n/k/a KERING AMERICAS, INC. RETIREMENT AND SAVINGS PLAN, <br><br> Plaintiff, <br><br> v. <br><br> GUCCI AMERICA, INC., BENEFIT PLANS COMMITTEE GUCCI AMERICA, INC. n/k/a BENEFIT PLANS COMMITTEE KERING AMERICAS, INC., KERING AMERICAS, INC., and DOES NO. 1- 10, Whose Names are Currently Unknown, <br><br> Defendants. | Civil Action No.: <br><br> **COMPLAINT** <br><br> JURY TRIAL DEMANDED |

## I.     INTRODUCTION

1.     Plaintiff, Heather Janda Hay ("Plaintiff"), individually and on behalf of the Gucci

America, Inc. Retirement and Savings Plan n/k/a the Kering Americas, Inc. Retirement and

Savings Plan ( the "Plan"),[1] brings this action under 29 U.S.C. § 1132 on behalf of the Plan

against Defendants, Gucci America, Inc. ("Gucci"), Benefit Plans Committee Gucci America,

Inc. n/k/a Benefit Plans Committee Kering Americas, Inc. ("Benefit Plans Committee"),[2] Kering

Americas, Inc. ("Kering"), and Does No. 1-10, who are members of the Benefit Plans Committee

and whose names are currently unknown (collectively, "Defendants"), for breach of fiduciary

duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. § 1001, *et seq*.

      2.     Defined contribution plans that are qualified as tax-deferred vehicles under

Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (*i.e.,* 401(k) plans), have

become the primary form of retirement savings in the United States and, as a result, America's *de*

*facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the

employer typically promises a calculable benefit and assumes the risk with respect to high fees or

under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a

manner in which participants bear the risk of high fees and investment underperformance.

      3.     The importance of defined contribution plans to the United States retirement

system has become increasingly pronounced, as employer-provided defined benefit plans have

become increasingly rare as an offered and meaningful employee benefit.

---

[1]During 2015, the Plan changed its name to Kering Americas, Inc. Retirement and Savings Plan. Any references herein to the Plan refers to the plan formerly known as Gucci America, Inc. Retirement and Savings Plan, and now known as the Kering Americas, Inc. Retirement and Savings Plan.

[2]Any references herein to the Benefits Plans Committee refers to the Benefits Plans Committee that Gucci appointed prior to January 1, 2016 and Kering has appointed since January 1, 2016 to administer the Plan.

4.       As of December 31, 2015, the Plan had assets totaling over $96.5 million. Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of 401(k) plans and the investment of 401(k) assets. The marketplace for 401(k) retirement plan services is well established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion. As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants, invest the assets of the Plan in a prudent fashion and ensure that Plan expenses are fair and reasonable.

5.       At all pertinent times, as explained below, Defendants: (a) were fiduciaries under ERISA; (b) breached their fiduciary duties under ERISA by failing to fully disclose to participants the expenses and risks of the Plan's investment options; (c) breached their fiduciary duties under ERISA by allowing unreasonable expenses to be charged to participants for administration of the Plan; and (d) breached their fiduciary duties under ERISA by selecting and retaining opaque, high-cost, and poor-performing investments instead of other available and more prudent alternative investments.

6.       To remedy these fiduciary breaches and other violations of ERISA, Plaintiff, individually and on behalf of the Plan, brings this action under Sections 502 and 409, 29 U.S.C. §§ 1132 and 1109, to recover and obtain all losses resulting from each breach of fiduciary duty. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate and just under all of the circumstances.

7.       Plaintiff specifically brings this action on behalf of the Plan under ERISA §§ 409

and 502, 29 U.S.C. §§ 1109 and 1132, to recover the following relief:

      a.      A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

      b.      A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

      c.      Equitable, legal or remedial relief for all losses and/or compensatory damages;

      d.      Attorneys' fees, costs and other recoverable expenses of litigation; and

      e.      Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.    THE PARTIES

8.      Plaintiff was a participant under 29 U.S.C. §1002(7) of the Plan, which is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34). Plaintiff is a resident of San Francisco, California. The Gucci America, Inc. Retirement and Savings Plan became effective on January 1, 1999, and served as a vehicle for retirement savings and to produce retirement income for employees of Gucci. It was established and maintained under a written document in accordance with 29 U.S.C. §1102. In 2015, the Gucci America, Inc. Retirement and Savings Plan was amended to change its name to the Kering Americas, Inc. Retirement and Savings Plan. It was established and has been maintained under a written document in accordance with 29 U.S.C. §1102, and serves as a vehicle for retirement savings and to produce retirement income for Kering Americas, Inc. Participating Employers, including, *inter alia*, Gucci. Retirement income generated by the Plan depends upon contributions made on behalf of each employee by the Participating Employer

(here, Gucci), deferrals of employee compensation and employer matching contributions, and from the performance of the Plan's investment options (net of fees and expenses). Upon information and belief, Gucci established a trust to hold participant and employer contributions and such other earnings, income and appreciation from Plan investments, less payments made by the Plan's trustee, to carry out the purposes of the trust, in accordance with 29 U.S.C. § 1103. Kering executed a new trust agreement, effective January 1, 2016, which established a trust to hold participant and employer contributions and such other earnings, income and appreciation from Plan investments, less payments made by the Plan's trustee, to carry out the purposes of the trust, in accordance with 29 U.S.C. § 1103 (the "Trust").

9.      Defendant, Gucci, is a corporation organized and existing under the laws of New York, with its principal place of business in Secaucus, New Jersey. Gucci is a wholly-owned subsidiary of Kering. Prior to January 1, 2016, Gucci was the Plan sponsor, Plan administrator, and a designated fiduciary of the Plan and a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.

10.     Defendant, Benefits Plans Committee, is a named fiduciary under the Plan, administers the Plan, and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102. The Benefits Plans Committee maintains its address at Gucci's headquarters in Secaucus, New Jersey. Prior to January 1, 2016, the Benefits Plans Committee and its members were appointed by Gucci to administer the Plan on Gucci's behalf. Since January 1, 2016, Kering has been responsible for appointing Benefit Plans Committee members to administer the Plan on Kering's behalf.

11.     Defendant, Kering, is a corporation organized and existing under the laws of

-5-

Delaware, with its principal place of business in New York, New York.  As of January 1, 2016, Kering is the Plan sponsor, Plan administrator, a designated fiduciary of the Plan and a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.

12.     Defendants, Does 1-10, are the members of the Benefits Plans Committee and, by virtue of their membership, are fiduciaries of the Plan.  Plaintiff is currently unable to determine the membership of the Benefit Plans Committee despite reasonable and diligent efforts because it appears that the current membership of the Benefits Plans Committee is not provided to the public.  As such, the defendants are named Does 1-10 as placeholders.  Plaintiff will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to name the members of the Benefits Plans Committees as defendants as soon as their identities are discovered.

### III.     JURISDICTION AND VENUE

13.     Plaintiff seeks relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under ERISA Section 409, 29 U.S.C. §§ 1109 and 1132.

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).

15.     Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Gucci's principal place of business is in this district and the Benefit Plans Committee is located in this district.  Furthermore, a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

## IV.    FACTUAL ALLEGATIONS

### A.    Background

16.    The Plan is a participant-directed plan in which participants direct the investment of their contribution's and Gucci's contributions into various investment options offered by the Plan.  Each participant's account is credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays Plan expenses from Plan assets, and substantially all administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The available investment options for participants of the Plan include various mutual funds and a common collective trust.

17.    Mutual funds are publicly-traded investment vehicles consisting of a pool of funds collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

18.    Common trusts are, in essence, mutual funds without the SEC regulation.  Common trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments.  Common trusts were first organized under state law in 1927, and were blamed for the market crash in 1929.  As a result, common trusts were severely restricted, giving rise to the more transparent and publicly-traded mutual funds.

Today, banks create common trusts only for their trust clients and for employee benefit plans like the Plan.  The main advantage of opting for a common trust, rather than a mutual fund, is the negotiability of the fees, so larger retirement plans are able to leverage their size for lower fees.

19.     The Plan's assets are held under the Trust, which is administered by State Street Bank and Trust Company ("State Street" or the "Trustee").  All investments and asset allocation are performed through the Trust.

20.     The Trust Agreement provides that the Trust "shall be administered by the Trustee for the exclusive purposes of providing benefits to Participants and their successors in interest." The Benefit Plans Committee has the authority to administer the Plan in accordance with the Plan and ERISA.

21.     Pursuant to the Plan, until December 31, 2015, Gucci, as the named and designated Plan administrator and fiduciary, appointed the Benefit Plans Committee.  As of January 1, 2016, Kering, as the named and designated Plan administrator and fiduciary, appoints the Benefit Plans Committee.

**B.     Defendants' Breaches of Fiduciary Duty**

22.     Defendants have severely mismanaged the Plan in a myriad of ways detailed below.  Defendants' mismanagement has been particularly egregious with respect to the Plan's investments in proprietary funds of Transamerica Retirement Solutions, LLC and affiliated entities (collectively, "Transamerica"), which is the service provider for the Plan, as Defendants have failed to exercise even minimal oversight over Transamerica and have unduly relied upon Transamerica.  As a result, Transamerica has successfully utilized Plan assets in a manner that has been detrimental to the Plan and beneficial to Transamerica insofar as it maximized fees,

often at the expense of participants' return.  Moreover, Defendants have permitted Transamerica to engage in transactions that constitute conflicts of interest.  Accordingly, Defendants have breached their fiduciary duties.

23.     In addition, Defendants have breached their fiduciary duties by failing to monitor the Plan's other investments to ensure that they provided adequate available returns and were not excessively priced, as were the vast majority of investments in the Plan, and by submitting inaccurate, misleading, and patently false disclosures regarding these investments.

24.     At all pertinent times prior to January 1, 2016, Gucci and the Benefit Plans Committee were responsible for selecting and monitoring the investments.  At all pertinent times on or after January 1, 2016, Kering and the Benefit Plans Committee were responsible for selecting and monitoring investments.  Defendants breached their fiduciary duties by imprudently failing to monitor the fees charged directly and indirectly to the Plan and its participants, and by failing to ensure that such fees were fair and reasonable under all of the circumstances.

25.     At all pertinent times prior to January 1, 2016, the Benefit Plans Committee and Gucci were responsible for offering prudent and sound advice with respect to the investments offered to participants in the Plan in the sole interest of the Plan participants, disclose necessary information such that the Plan participants could make informed decisions, and to ensure that the fees and expenses charged with respect to these investments were fair and reasonable.  At all pertinent times on or after January 1, 2016, the Benefit Plans Committee and Kering were responsible for the same.  Defendants breached those fiduciary duties.

26.     At all pertinent times prior to January 1, 2016, the Benefit Plans Committee was legally responsible for monitoring the advice and services provided by the Plan's service

providers.  At all pertinent times on or after January 1, 2016, Kering and the Benefit Plans

Committee were responsible for the same.  In light of the apparent breaches of fiduciary duty in

terms of both poor investment options and blatantly excessive fees, it is apparent that Defendants

breached those fiduciary duties.

        **1.**        **Lack of Oversight Over and Undue Reliance on Transamerica**

       27.      At all relevant times, Transamerica, f/k/a Diversified Retirement Corporation,

served as the Plan's recordkeeper.  In addition to its role as recordkeeper, Transamerica[3] has also

served as an investment manager because a significant portion of the Plan has always been

invested in Transamerica funds.[4]

       28.      Currently, the Plan offers the following Transamerica funds as investment

options:

| Investment Options | Expense Ratio | Expense Ratio After Voluntary Fee Waiver |
|---|---|---|
| Transamerica Partners Government Institutional Money Market | 0.62% | 0.50% |
| Transamerica Partners Institutional Core Bond | 0.71% | 0.65% |
| Transamerica Partners Institutional High Yield Bond | 0.91% | 0.85% |
| Transamerica Partners Institutional Stock Index | 0.42% | 0.30% |

---

[3]Specifically, Transamerica Asset Management ("TAM"), an affiliate of Transamerica Retirement Solutions Corporation, serves as the investment manager.

[4]Transamerica Financial Advisors, Inc. ("TFA"), an affiliate of Transamerica Retirement Solutions Corporation, is the administrator to each fund.

| Transamerica Partners Institutional Mid Value | 1.02% | 0.90% |
|---|---|---|
| Transamerica US Growth I | 0.99% | 0.87% |
| Diversified Institutional Stable Pooled Fund | 0.60 - 0.90% | |

29.     In addition, as indicated above, the Plan offers the Diversified Institutional Stable Pool Fund as an investment option, which is managed by a Transamerica affiliate, Diversified Investment Advisers.  The Diversified Institutional Stable Pool Fund is exempt from registration with the SEC.

30.     All of the Transamerica funds that the Plan offers as investment options are proprietary funds, despite the fact that the Transamerica website advertises that "we can offer access to the entire universe of publicly available investments – **_without any proprietary fund requirements_**" (emphasis added).  A proprietary fund, also known as a house-brand fund, is created when the brokerage firm that distributes the fund also serves as the fund's investment manager.  Thus, Transamerica both distributes the funds in which the Plan invests, and manages the Plan's investments in the Transamerica funds.

31.     Upon information and belief, prior to 2011, none of the Transamerica funds offered within the Plan were institutional funds or share classes, despite the fact that institutional funds are usually less costly.  Institutional funds typically manage money for large institutional investors, such as pension funds, and typically offer lower management expense ratios (*i.e.,* operating fees plus management fees) than non-institutional funds.  The annualized expense ratios of the non-institutional Transamerica funds offered within the Plan had high expense ratios, yet Transamerica opted to invest in expensive, non-institutional funds although less costly

institutional alternatives were available.

32.     As of 2011, five of the seven Transamerica funds, which held slightly less than half of the proprietary assets, were institutional funds. The remaining proprietary assets were held in the Diversified Stable Pooled Fund (currently listed as an institutional fund, although never designated as such prior to 2015) and the WMC Diversified Equity Partners Fund (no longer listed under investment options for the Plan).   Although the institutional funds apparently reduced the cost of investing in these proprietary funds by approximately 25 basis points (0.25%), the proprietary institutional government money market fund currently offered – Transamerica Partners Government Institutional Money Market – is significantly costlier than the non-government fund previously offered.  The government money market fund has an expense ratio of 50 basis points (0.50%), whereas the non-government fund has an expense ratio of 26 basis points (0.26%).

33.     While the cost of investing in Transamerica's proprietary funds has come down slightly as a result of moving to institutional shares, the Transamerica institutional shares are significantly more costly than non-proprietary institutional funds.  As indicated below, the Transamerica Partners funds Institutional Class shares are significantly higher than Vanguard Institutional Class shares, even after the voluntary expense ratio reduction:

|  | **Transamerica Expense Ratio (after voluntary waiver)** | **Vanguard Expense Ratio** |
|---|---|---|
| Transamerica Partners Government Institutional Money Market | 0.50% | 0.01 - 0.10% |
| Transamerica Partners Institutional Core Bond | 0.65% | 0.02 - 0.15% |
| Transamerica Partners Institutional High Yield Bond | 0.85% | 0.13% |
| Transamerica Partners Institutional Stock Index | 0.30% | 0.04 - 0.08 % |
| Transamerica Partners Institutional Mid Value | 0.90% | 0.08 - 0.25% |
| Transamerica US Growth I | 0.87% | 0.07 - 0.28% |

34. The Diversified Institutional Stable Pooled Fund has an expense ratio of either 0.60% or 0.90%.

35. The Diversified Institutional Stable Pooled Fund is a "fund of funds," as explained in more detail below, and thus it invests in other funds. In particular, the fund invests in the Wells Fargo Stable Return Fund G, which is a collective trust fund of Wells Fargo. Because the Plan does not directly invest in the Wells Fargo Stable Return Fund G and, instead, invests through the Diversified Institutional Stable Pooled Fund, it is subject to an additional layer of fees and thus a higher expense ratio. Had the Plan invested directly in the Wells Fargo Stable Return Fund G, it would have been subject to the lesser expense ratio of 23.9 basis points (0.239%).

36. The excessive fees that the Plan pays Transamerica directly is only a part of the

way in which Defendants have allowed Transamerica to profit at participants' expense.  In addition, the Plan's Form 5500s state that Transamerica receives substantial revenue sharing (generally approximately 40 basis points (0.40%)) from the third-party mutual funds and one of the Transamerica funds.  The Forms 5500 reported the following revenue that Transamerica, or its predecessor-in-interest (Diversified Investment Advisors) received from the Plan:

| Year | Amount |
|------|--------|
| 2009 | 29.01 - 62.855 basis points |
| 2010 | 29.01 - 62.855 basis points plus $12 - $18 per participant shared among service providers for certain funds |
| 2011 | 24.375 - 63.375 basis points plus $12 - $18 per participant shared among service providers for certain funds[5] |
| 2012 | 24.390 - 63.414 basis points plus $18 per participant shared among service providers for certain funds[6] |
| 2013 | 24.390 - 63.414 basis points |
| 2014 | 24.390 - 63.414 basis points |
| 2015 | 24.390 - 63.414 basis points |

37.     At all pertinent times, Defendants have failed to ensure that all revenue sharing is utilized on a dollar-for-dollar basis to reduce other Plan expenses and have failed to levelize or equalize the burden imposed by revenue sharing across participants to ensure that they each pay Plan expenses in an equitable manner.

---

[5]The recordkeeper listed is Diversified Retirement Corporation, an affiliate of Transamerica.

[6]The recordkeeper listed is Diversified Retirement Corporation, an affiliate of Transamerica.

38.     Transamerica proprietary funds are also "manager of manager" or "funds of funds," whereby the proprietary fund created by Transamerica does not directly invest in securities.  Instead, Transamerica selects an underlying master fund, which is managed by a sub-adviser, through which it invests in securities.  Transamerica determines the fund's goals and investment strategies, and selects the sub-adviser to manage the fund's assets.

39.     Because Transamerica's proprietary funds are "manager of manager" funds, the Plan is required to pay multiple layers of the fees: (1) to Transamerica, as the fund manager, and (2) to the sub-adviser of the underlying master fund.  This structure imposes unnecessary and burdensome costs on the Plan and its participants.

40.     Given that 401(k) participants generally select the funds in which they invest, there is no need for participants to pay a fee to an overseeing adviser to create sub-advised funds from which participants can choose.  The structure of the Transamerica funds creates an unnecessary layer of fees.

41.     In addition, the Transamerica funds create an extra layer of costs insofar as TFA, the Transamerica funds administrator, has outsourced the provision of most services to State Street.  Rather than contracting directly with State Street, the Transamerica funds create an extra layer of costs by designating TFA as the administrator.

42.     According to the Transamerica Partners Funds Group Semi-Annual Report (June 30, 2015), Transamerica Fund Services, Inc. ("TFS") provides supervisory and administrative services to the Transamerica funds, for which TFS receives a fee of 30 basis points (0.30%) from each Transamerica fund, and Transamerica Capital Inc. ("TCI") serves as the principal underwriter for the Transamerica Partners Funds Group, for which TCI receives a 12b-1

distribution fee[7] of 25 basis points (0.25%) from each Transamerica fund.[8]  These added costs

contribute to the Transmerica funds' high expense ratio.

43.     As indicated in the chart above, a portion of the fee for the majority of

Transamerica funds has been voluntarily waived through May 1, 2017.  In other words, the

excessive fees that Transamerica currently charges and considers "reasonable" could actually be

even higher as a matter of contract.  Although these fee waivers make the Transamerica funds

appear more in line with competitors' fees, the portion of the fee currently waived could be

reinstated (without shareholder approval) at any time.

44.     Rather than exercise any sort of oversight over the Plan's investment of assets in

the Transamerica funds, Defendants have chosen to blindly accept Transamerica's determination

that investing in expensive funds and adding an unnecessary layer of costs (which directly

benefits Transamerica insofar as it utilizes its affiliates, as discussed below) constitutes

reasonable and prudent behavior.  In doing so, Defendants have breached their fiduciary duties.

**2.     Transamerica's Conflicts of Interest**

45.     As the "manager of managers" of the fund, Transamerica has the unilateral right

to hire and fire sub-advisers and to vary the amount of assets allocated to a given sub-adviser.  To

the extent that Transamerica is able to select a sub-adviser with a low sub-advisory fee,

Transamerica can adjust the revenue it derives from the fund and ultimately from the Plan.  As

such, Transamerica has disclosed in its SEC Form ADV that it is subject to a conflict of interest

---

[7]12b-1 fees are "[f]ees paid out of fund assets to cover the costs of marketing and selling fund shares."  https://www.investor.gov/additional-resources/general-resources/glossary/12b-1-fees.

[8] In March 2014, Transmerica reduced the 12b-1 fees on its Class A shares from 30 basis points (0.30%) to 25 basis points (0.25%).

in allocating fund assets to sub-advisers.

46.     Indeed, Transamerica has been hiring its affiliates as subadvisers.  This poses potential conflicts of interest because Transamerica will receive more revenue when it selects an affiliated fund rather than an unaffiliated fund.  In its Form ADV, Transamerica disclosed that this conflict might provide an incentive to include affiliated funds as investment options and to cause investments in affiliated funds to perform less well than unaffiliated funds.

47.     The SEC granted Transamerica an exemption, which allows it to employ a new unaffiliated sub-adviser without shareholder approval, but Transamerica must obtain shareholder approval to appoint an affiliated sub-adviser.

48.     In recent years, Transamerica has hired its affiliate, Aegon, as sub-advisor for certain funds.  Since 2014, Aegon has sub-advised the Transamerica Partners Institutional Core Bond Fund and the Transamerica Partners Institutional High Yield Bond Fund.  In addition, Aegon has sub-advised the Transamerica Partners Government Institutional Money Market Fund since 2013.

49.     Each of the funds Aegon currently sub-advises has a history of poor performance. The Transamerica Partners Institutional Core Bond Fund has inconsistent performance, underperforming over a ten-year period.  The Transamerica Partners Institutional High Yield Bond Fund has poor long-term performance.  The Transamerica Partners Government Institutional Money Market Fund has underperformed its peers and benchmarks for all periods. Given Aegon's underperformance, it is difficult to justify the hefty fees that the Plan pays to invest in those funds.

**3.      The Plan's Other Investment Options Are Also Subject to Excessive Fees**

50.      In addition to Defendants' gross lack of oversight over Transamerica in its role as investment manager, which has resulted in participants paying excessive fees for sub-par performance, Defendants have breached their fiduciary duties to the extent that Defendants have consistently offered participants of the Plan other investment options, apart from the Transamerica funds, that are excessively priced and offer inadequate returns.

51.      Currently, the Plan's other investment options include the following 18 mutual funds:

| Investment Options | Expense Ratio |
|---|---|
| JP Morgan Equity Income R6 | 0.50% |
| American Century Inflation-Adjusted Bond Investor Class | 0.47% |
| Columbia Contrarian Core Z | 0.84% |
| Baron Asset Retail Class | 1.31% |
| DFA US Small Cap I | 0.52% |
| American Funds EuroPacific Growth Fund R3 | 1.14% |
| T. Row Price Retirement Balanced Advisor Class | 0.82% |
| T. Rowe Price Retirement 2005 Fund – Advisor Class | 0.85% |
| T. Rowe Price Retirement 2010 Fund – Advisor Class | 0.84% |
| T. Rowe Price Retirement 2015 Fund – Advisor Class | 0.87% |
| T. Rowe Price Retirement 2020 Fund – Advisor Class | 0.91% |
| T. Rowe Price Retirement 2025 Fund – Advisor Class | 0.94% |
| T. Rowe Price Retirement 2030 Fund – Advisor Class | 0.97% |
| T. Rowe Price Retirement 2035 Fund – Advisor Class | 0.99% |
| T. Rowe Price Retirement 2040 Fund – Advisor Class | 1.01% |
| T. Rowe Price Retirement 2045 Fund – Advisor Class | 1.01% |

| T. Rowe Price Retirement 2050 Fund – Advisor Class | 1.01% |
|---|---|
| T. Rowe Price Retirement 2055 Fund – Advisor Class | 1.01% |

52.     Each of these funds that the Plan offers are subject to excessive fees, although virtually all of the third-party funds offer institutional and other lower priced shares and there are less costly comparable alternatives in the market.

53.     The JP Morgan Equity Income R6 fund features non-institutional shares with an expense ratio of 50 basis points (0.50%).  Although one of the cheapest investment options offered by the Plan, the JP Morgan Equity Income R6 Fund has substantially higher fees than the Vanguard 500 Index Fund Admiral Shares, a comparable fund.  The expense ratio for the Vanguard 500 Index Fund Admiral Shares is ten times less at 5 basis points (0.05%).

54.     The American Century Inflation-Adjusted Bond Investor Class fund consists of investor class shares with an expense ratio of 47 basis points (0.47%).  In contrast, the institutional shares have only a 27 basis point (0.27%) expense ratio.

55.     The Baron Asset Retail fund is the costliest investment option for the Plan, with an expense ratio of 1.31%.  The institutional shares charge 1.04%.   Rather than utilize the less expensive institutional alternative, the Plan offers the non-institutional option, which has underperformed on the Standard & Poors 500 Index on a three, five, and ten year basis.  The Baron Asset Retail fund's fees are considerably excessive in comparison with a similar fund, the Vanguard Mid-Cap Index Fund Admiral Shares, which offers an expense ratio of 8 basis points (0.08%).

56.     The DFA US Small Cap I fund is the only institutional third-party fund offered in

the Plan.  Nonetheless, the fees charged by the DFA US Small Cap I fund are substantially higher than a comparable alternative, the Vanguard Small-Cap Growth Index Fund Institutional Shares, which offers an expense ratio of 7 basis points (0.07%).

57.     The American Funds EuroPacific Growth Fund R3 includes a 50 basis points (0.50%) 12b-1 fee in its expense ratio, which the other American Funds EuroPacific Growth Fund shares (R4, R5, and R6) do not have.  As a result, the Plan is paying excessive fees that it could otherwise avoid by selecting a different class of shares.  For example, the R6 shares have an expense ratio of 50 basis points (0.50%), which is the amount the Plan is currently paying in 12b-1 fees alone.

58.     All of the T. Rowe Price Target Date Funds offered in the Plan are Advisor Class shares, which have an additional 25 basis points (0.25%) 12b-1 fee that the Investor Class shares do no have.  Thus, the total annual fund operating expenses of the T. Rowe Price Target Date Funds offered by the Plan is 25 basis points (0.25%) greater than the alternative fund featuring Investor Class Shares.  Each of the expense ratios of the various target date funds are considered high, and they are blatantly excessive when compared with the Vanguard Institutional Target Date Funds, a comparable alternative.  The T. Rowe Price Target Date Funds expense ratios are as much as ten times greater than the Vanguard Institutional Target Date Funds, which range from 9 to 10 basis points (0.09 - 0.10%).  When a participant fails to direct his or her investments into a particular fund, this is the default fund selected for the participant.   Indeed, Plaintiff's contributions were invested exclusively in the T. Rowe Price 2050 Target Date Fund.

59.     In sum, Defendants have imprudently failed to reduce costs when possible, and to the contrary, the majority of the investments Defendants have selected are among the most

expensive when compared to comparable funds.

60.     Defendants also have failed to offer an appropriate compliment of passively managed mutual funds within the Plan.  Since actively managed funds virtually never outperform passively managed mutual funds once fees are taken into account and it is essentially impossible to predict which of the thousands of actively managed funds will, in fact, be the minuscule number that outperform passively managed funds, it is almost certainly a breach of fiduciary duty to offer investments in actively managed funds and it is indisputably a breach of fiduciary duty to fail to offer an appropriate compliment of passively managed funds so that participants can choose a passive, as opposed to an active, strategy if they so choose and based upon the reality that actively managed mutual funds are virtually never a prudent investment choice for Plan participants.

### 4.     Misleading and Inaccurate Disclosures

61.     While the Plan's Audited Financial Statements for 2009, 2010, 2011, and 2012 indicate that substantially all of the Plan's investments are shares of mutual funds or money market funds managed by State Street, this has never been the case.

62.     For example, the 2009 Form 5500 indicates that substantially all of the Plan's investments are in mutual funds managed by State Street, which qualifies as a permitted party in interest as defined by ERISA.  However, as the Schedule of Assets indicates, this is not accurate. Only a small amount of assets, valued at $431,282, are held in a State Street Cash Reserve Account, whereas the overwhelming majority of assets, totaling over $36.6 million, are invested in mutual funds managed by others.

63.     Likewise, for 2010, the Form 5500 indicates that substantially all of the Plan's

investments are in mutual funds managed by State Street, but the Schedule of Assets demonstrates otherwise. Of the over $44.3 million in assets invested in mutual funds, only $526,242 was held by State Street.

64.     The 2011 Form 5500 states that substantially all of the Plan's investments are shares of mutual funds or money market funds managed by State Street, which is a permitted party-in-interest, as defined by ERISA.  However, the Schedule of Assets indicates this is not accurate.  The total assets invested in mutual funds was over $47.5 million, whereas State Street held assets valued at $19,800.

65.     The 2012 Form 5500 similarly states that substantially all of the Plan's investments are in mutual funds managed by State Street, but the Schedule of Assets demonstrates otherwise. As of December 31, 2012, State Street held less assets than ever before, a mere $8,418, while the total assets invested in mutual funds was over $58.2 million.

66.     For the first time, in 2013, the Form 5500 indicates that the Plan permits the payment of Plan expenses from Plan assets.  Substantially all administrative expense associated with the Plan are paid by Plan participates as a reduction of investment income.  Under the Party-in-Interest Transactions section, the Form 5500 discloses, for the first time, that participants of the Plan can invest in certain funds managed by State Street, the trustee, and Transamerica, the recordkeeper.  As such, transactions between the participants and these funds qualify as "party-in-interest transactions." Omitted, for the first time, is the inaccurate representation that substantially all of the Plan's investments are in funds managed by State Street.

67.     Although the 2014 Form 5500 discloses that transactions involving Transamerica funds are party-in-interest transactions, the schedules misleadingly do not indicate that these

-22-

funds (except the Diversified Stable Pooled Fund) are parties-in-interest.

68.     As demonstrated, Defendants caused to be disseminated misleading information

that failed to inform participants about the true nature of their investments.

## V.     ERISA'S FIDUCIARY STANDARDS

69.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plans.  29 U.S.C. §1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a
> plan solely in the interest of the participants and
> beneficiaries    and –
>
> (A)     for the exclusive purpose of:
>
>> (i)     providing benefits to participants and their
>>         beneficiaries; and
>>
>> (ii)    defraying reasonable expenses of
>>         administering the plan;
>
>         [and]
>
> (B)     with the care, skill, prudence, and diligence under
>         the circumstances then prevailing that a prudent
>         man acting in a like capacity and familiar with such
>         matters would use in the conduct of an enterprise of
>         a like character and with like aims.

70.     Under 29 U.S.C. 1103(c)(l), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any
> employer and shall be held for the exclusive purposes of
> providing benefits to participants in the plan and their
> beneficiaries and defraying reasonable expenses of
> administering the plan.

71.     Under ERISA, fiduciaries that exercise any authority or control over plan assets,

including the selection of plan investments and service providers, must act prudently and solely

in the interest of participants in a plan.

72.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.

73.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 1104(a)(l) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

74.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring a civil action to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).  Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## COUNT I
### (For Breach Of Fiduciary Duty)

75.    Plaintiff incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

76.    Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

77.    As a direct result of Defendants' breaches of duties, Plaintiff and the Plan have suffered losses and damages.

78.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (In The Alternative, Liability For Knowing Breach Of Trust)

79.     Plaintiff incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

80.     In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a breach of trust.

81.     To the extent any of the Defendants are not deemed to be fiduciaries and/or not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of poor and expensive investment options that cannot be justified in light of the size of the Plan and the other expenses of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Plan, demands judgment against Defendants, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which Plaintiff and the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: September 15, 2017          Respectfully submitted,

SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP


/s/ James C. Shah
James C. Shah
475 White Horse Pike
Collingswood, NJ 08107
Telephone: (856) 526-1100
Facsimile: (866) 300-7367
Email: jshah@sfmslaw.com

-27-

James E. Miller
Laurie Rubinow
Shepherd Finkelman Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile:  (866) 300-7367
Email: jmiller@sfmslaw.com
        lrubinow@sfmslaw.com

Sahag Majarian
Law Offices of Sahag Majarian
18250 Ventura Blvd.
Tarzana, CA 91356
Telephone: (818) 609-0807
Facsimile:  (818) 609-0892
Email: sahagii@aol.com

*Attorneys for Plaintiff*
*and the Plan*